1  JOSEPH S. BEEMSTERBOER
   Acting Chief
2  KEVIN LOWELL (Maryland Bar)
   Trial Attorney
3  U.S. Department of Justice
   Criminal Division, Fraud Section
4  1400 New York Avenue, NW
   Washington, D.C. 20530
5  Telephone: (202)262-7795
   Email: Kevin.Lowell@usdoj.gov
6
   RANDY S. GROSSMAN
7  Acting United States Attorney
   DANIEL C. SILVA (Cal. Bar No. 264632)
8  MARK W. PLETCHER (Colorado Bar No. 034615)
   LISA J. SANNITI (Ohio Bar No. 86670)
9  CARL F. BROOKER, IV (Wash. D.C. Bar No. 1022908)
   Assistant United States Attorney
10 880 Front Street, Room 6293
   San Diego, California 92101-8893
11 Telephone: (619) 546-9713
   Email: Daniel.C.Silva@usdoj.gov
12
13              **UNITED STATES DISTRICT COURT**

14            **SOUTHERN DISTRICT OF CALIFORNIA**

15 UNITED STATES OF AMERICA,          Case No. 21 UC 2542

16              Plaintiff,

17      v.                            PLEA AGREEMENT

18 GLENN ARCARO,

19              Defendant.

20      IT IS HEREBY AGREED between the plaintiff, UNITED STATES OF AMERICA,

21 through its counsel, JOSEPH S. BEEMSTERBOER, Acting Chief, Kevin Lowell, Trial

22 Attorney, and RANDY S. GROSSMAN, Acting United States Attorney, Daniel C. Silva,

23 Mark W. Pletcher, Lisa Sanniti, and Carl Brooker, Assistant U.S. Attorneys, and Defendant

24 GLENN ARCARO ("ARCARO" or "Defendant"), with the advice and consent of Mary

25 Carter Andrues and Vicki I. Podberesky, counsel for Defendant, as follows:

26                                      I
                                   **THE PLEA**
27 A.    **The Charge**

28 Defendant agrees to waive indictment and plead guilty to an information (the

Def. Initials _GA_

1  "Information") charging Defendant with one count of conspiracy to commit wire fraud, in
2  violation of 18 U.S.C. § 1349.

3  **B.    Prosecution of Additional Counts**

4      In exchange, the United States agrees not to bring any additional criminal charges
5  against Defendant for conduct outlined in the "Factual Basis" section of this Plea
6  Agreement, unless Defendant breaches the Plea Agreement or the guilty plea pursuant to
7  this Plea Agreement is set aside for any reason.  Defendant expressly waives all
8  constitutional, equitable, and statutory defenses to the reinstatement of any charges not
9  pursued as a result of this agreement.  Should Defendant commit perjury or give a false
10  statement, the United States, at its sole discretion, will be free to prosecute Defendant for
11  that offense, move to set aside this Plea Agreement, and be relieved of its obligations under
12  this agreement.  In addition, the attached financial addendum shall govern restitution and
13  forfeiture in this case.

**II**
**NATURE OF THE OFFENSE**

14  **A.    Elements of the Offense**

15  **Count 1—Conspiracy to Commit Wire Fraud**

16      The conspiracy offense in Count 1 of the Information to which Defendant is pleading
17
18  guilty has the following elements:

19      a.    There was an agreement among two or more persons to commit or attempt to
20  commit the offense of wire fraud, in violation of 18 U.S.C. § 1349;

21      b.    The defendant became a member of the conspiracy with the intent to further
22  its unlawful purpose; and

23      c.    The offense of wire fraud, the object of the conspiracy alleged in Count One
24  of the Information, has the following elements:

        i.    The defendant knowingly participated in, devised, or intended to devise
25              a scheme or plan to defraud, or a scheme or plan for obtaining money
26              or property by means of false or fraudulent pretenses, representations,
                promises, or omitted facts;

27      ii.   The statements made or facts omitted as part of the scheme were
28              material—that is, they had a natural tendency to influence, or were
                capable of influencing, a person to part with money or property;

Plea Agreement                                                    2                              Def. Initials _CA_

    iii.    The defendant acted with the intent to defraud—that is, the intent to deceive and cheat; and

    iv.    The defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

**B.**    <u>**Elements Understood and Admitted – Factual Basis**</u>

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each of the elements of the crimes and admits that there is a factual basis for this guilty plea. Defendant agrees that the following facts are true and undisputed, and that had this case proceeded to trial, the United States would have proved these facts beyond a reasonable doubt:

<u>**Summary of the Fraud**</u>

1.    From in or about January 2017 to in or about January 2018, BitConnect operated a global cryptocurrency Ponzi scheme that defrauded retail investors of over $2 billion through investments in BitConnect's "Lending Program."

2.    BitConnect exploited investor interest in cryptocurrency markets by fraudulently marketing its purported blockchain technology, cryptocurrency, and digital currency exchange to the public as a lucrative investment.

3.    BitConnect lied to investors about how its purported proprietary technology, known as the "BitConnect Trading Bot" and "Volatility Software," would generate substantial profits and "guaranteed returns" to investors by using investors' money to trade on the volatility of cryptocurrency markets.

4.    Instead, BitConnect operated a textbook Ponzi scheme and paid earlier BitConnect investors with money from later BitConnect investors.

5.    Once it received investors' funds, BitConnect laundered the investors' funds internationally through a collection of its cryptocurrency wallets, known as the "BitConnect Cluster," in order to promote and conceal the underlying fraud.

Plea Agreement                3                Def. Initials _CA_

6.      BitConnect also operated a global Pyramid Scheme, known as the "Referral Program," through which BitConnect paid additional income to a network of international and U.S.-based promoters to lure unsuspecting investors to invest in BitConnect.

7.      BitConnect's Referral Program was organized hierarchically, with continental, national, and regional promoters each occupying specific tiers within the pyramid structure and earning a certain percentage based upon which tier they occupied—with those promoters towards the top of the pyramid earning a greater percentage of income than those beneath them.

8.      To avoid regulatory scrutiny and oversight, BitConnect also evaded and circumvented U.S. regulations governing the financial and securities industries.

9.      Thousands of investors from all over the world, including residents of the Southern District of California, lost their money by investing in BitConnect.

10.     ARCARO reported no less than $24 million in income from his participation in the BitConnect fraud (generally referred to as the "Scheme") in his 2017 U.S. individual income tax return.

**<u>Relevant Entities and Individuals</u>**

11.     BitConnect was an unincorporated organization established in approximately 2016.  Bitconnect registered several companies with Companies House in the United Kingdom, which were all part of BitConnect.  One of those companies was Bitconnect International PLC, which was registered on or about September 18, 2017.

12.     BitConnect conducted its business on the internet, principally by means of websites accessible at bitconnect.co and www.bitconnectcoin.co (the "BitConnect Website").  The BitConnect Website was accessible worldwide to the general public, including residents of the Southern District of California, and throughout the United States, and who in fact did access the BitConnect Website.

13.    Firm 1 was an entity that assisted clients with obtaining foreign passports, setting up offshore financial accounts, investing in gold and precious metals, as well as other assets, and reducing their tax obligations.

14.    The "BitConnect Founder," a citizen and resident of India, founded, managed, and controlled BitConnect. The BitConnect Founder used pseudonyms in order to conceal his identity and control over BitConnect, and directed BitConnect's international network of promoters and affiliates, including ARCARO.    The BitConnect Founder also disseminated information regarding BitConnect's various investment programs to BitConnect's network of promoters and affiliates for further dissemination to the investing public.    The BitConnect Founder caused thousands of investors worldwide to invest into BitConnect.

15.    ARCARO, a resident of Los Angeles, California, served as BitConnect's "national promoter" in the United States from in or about August 2017 to 2018 and was responsible for managing a team of U.S.-based promoters for BitConnect.    Around this general time period, ARCARO marketed other high yield investment programs, or "HYIPs," such as BitConnect.    According to paperwork filed with Companies House in the United Kingdom, on or about September 18, 2017, ARCARO was listed as one of the directors and a shareholder of Bitconnect International PLC.    ARCARO served as one of the most prolific and successful promoters of BitConnect.    The BitConnect Founder supervised and directed ARCARO.

### Relevant Federal Agencies

16.    The United States Securities and Exchange Commission ("SEC") was an independent agency of the executive branch of the United States government.    The SEC was responsible for enforcing federal securities laws and promulgating rules and regulations in keeping with the same.

17.    The Financial Crimes Enforcement Network ("FinCEN") was an agency of the U.S. Department of the Treasury.    FinCEN was responsible for regulating financial institutions in connection with compliance with the Bank Secrecy Act.

**Relevant Terminology**

18.    "Digital asset" or "digital token" generally referred to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets referred to as "cryptocurrencies," "virtual currencies," "digital coins," and "digital tokens."

19.    The "blockchain" was a distributed public ledger that recorded incoming and outgoing cryptocurrency transactions.

20.    An initial coin offering ("ICO") was a capital raising event in which an entity offered investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies or fiat currency. These tokens were issued on a blockchain and were oftentimes listed on online platforms, called virtual currency exchanges, where they were tradable for virtual or fiat currencies.

21.    To participate in an ICO, investors were typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During an ICO, or after its completion, the issuer would typically distribute its unique "tokens" to the participants' unique address on the blockchain. Similar to stockholders in an initial public offering ("IPO"), holders of these tokens were then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

22.    "Bitcoin" was a type of cryptocurrency. Bitcoin were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin could be used for purchases or exchanged for other currency on currency exchanges. Bitcoin was commonly known as BTC.

23.    A "trading bot" was computer software programmed to trade a digital asset based upon predetermined parameters.

24.    A "cryptocurrency wallet" was a digital wallet used to store, send, and receive digital currency like Bitcoin.  Each digital wallet had a unique digital address containing letters and numbers that were used in order to send and receive cryptocurrency transactions.

25.   A "cluster" referred to a collection of related cryptocurrency wallets or addresses usually under the control of a single entity and/or affiliated individuals.

26.   A "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others. Federal law required that an issuer of securities register offers and sales of those securities with the SEC when they offered and sold securities to the public, absent certain specified exemptions.

27.   A money transmitting business, or "MTB," included any person doing business whether on a regular basis or as an organized business concern, including businesses operating a digital currency exchange in which such businesses exchanged one virtual currency into another virtual currency. Because they were considered financial institutions, federal law required MTBs, including digital currency exchanges, to be registered with FinCEN. The failure to register with FinCEN was a federal felony offense.

**Relevant Factual Background**

**The Formation of BitConnect**

28.   In approximately 2016, the BitConnect Founder created BitConnect. To do so, the BitConnect Founder caused the creation of a native digital token called the "BitConnect Coin" ("BCC"), which was based on its own blockchain. The BitConnect Website provided potential investors with information about BitConnect's investment programs and an account login link.

29.   From in or about November 2016 to in or about January 2017, the BitConnect Founder and others conducted an ICO of BCC and introduced BCC to the investing public. BCC was a cryptocurrency controlled by BitConnect. BitConnect claimed that BCC was an open-source, decentralized cryptocurrency.

30.   The BitConnect Founder recruited BitConnect promoters and affiliates, including ARCARO, from Asia, Europe, North America, Australia, and elsewhere to

7

Plea Agreement                                                    Def. Initials

promote BitConnect.   The BitConnect Founder explained BitConnect's blockchain technology, investment opportunities, and investment returns to the BitConnect promoters and affiliates.

### *BitConnect's Lending Program*

31.    Beginning in 2017, BitConnect's marketing materials centered on BitConnect's "Lending Program."   The Bitconnect Founder used a network of promotors/affiliates, including ARCARO, to aggressively market the Lending Program to the investing public.

32.    BitConnect offered and sold the Lending Program as a series of transactions or schemes, and therefore, as securities, because it promoted the Lending Program as an investment of money into a common enterprise with other investors and with BitConnect and its promoters, with the reasonable expectation of profit from the efforts of BitConnect.

33.    BitConnect never registered its Lending Program as an offering and sale of securities with the SEC; nor did it have a valid exemption from this registration requirement.

34.    In its marketing materials, BitConnect touted its proprietary "Trading Bot" and "Volatility Software" as the centerpiece of its Lending Program knowing the marketing materials contained multiple fraudulent statements.  BitConnect represented that it would use investors' money as working capital to fund its own investment activity.  Specifically, it fraudulently claimed its proprietary Trading Bot and Volatility Software would generate substantial profits to investors by trading on the volatility of cryptocurrency markets.

35.    To entice investors to invest, BitConnect posted misleading information about the Lending Program's purported daily interest rates and historical returns on the BitConnect Website, and advertised the Lending Program on Coinmarketcap.com, a popular website in the digital asset space that tracked price, available supply, trade volume, and market capitalization of various digital tokens.

36.    To participate in the Lending Program, an investor was first required to create an account on the BitConnect Website, and then to transfer Bitcoin to a Bitcoin blockchain

8

Def. Initials   *CA*

1   address provided to the investor and controlled by BitConnect. BitConnect pooled the

2   investors' Bitcoin in a series of addresses, or digital wallet, on the Bitcoin blockchain,

3   which BitConnect controlled.

4        37.   The investor's account page on the BitConnect Website would then reflect the

5   investor's Bitcoin investment in the investor's Bitcoin wallet.

6        38.   The investor would then remit the Bitcoin to BitConnect to purportedly

7   purchase BCC tokens on the BitConnect Exchange, a digital currency exchange, and then

8   "lend" the BCC tokens to BitConnect, which, in turn, would purportedly invest these

9   proceeds into the volatility of Bitcoin via the Trading Bot.

10       39.   BitConnect charged Lending Program investors an exchange fee through the

11  BitConnect Exchange each time they exchanged their Bitcoin for BCC or exchanged BCC

12  back into Bitcoin.

13       40.   Although BitConnect operated an MTB through its BitConnect Exchange,

14  BitConnect never registered with FinCEN, nor complied with the statutes and regulations

15  governing an MTB under the Bank Secrecy Act, as found at Title 31, United States Code

16  and Title 31 of the Code of Federal Regulations.

17       41.   In truth, the Lending Program was a massive Ponzi scheme. BitConnect did

18  not use a Trading Bot and Volatility Software to generate income for investors and instead

19  used money from newer BitConnect investors to pay off older BitConnect investors.

20       42.   Through the Lending Program, BitConnect obtained more than $2 billion

21  from retail investors worldwide.

22       ***BitConnect's Referral Program***

23       43.   BitConnect also operated a Pyramid Scheme known as the Referral Program

24  through which BitConnect relied on BitConnect promoters in order to promote and direct

25  investors to invest in BitConnect's Lending Program.

26       44.   ARCARO and other promoters used unique internet hyperlinks known as

27  "referral links" to offer the BitConnect Lending Program on their personal social media

28  pages. Investors, in turn, used the referral links to access the BitConnect Website and

9

invest in BitConnect's Lending Program.  BitConnect paid commissions to ARCARO and other promoters who successfully convinced investors to invest in the Lending Program. The referral links ensured that ARCARO and other promoters were compensated by BitConnect with the appropriate commission.

45.   ARCARO led and supervised a large network of promoters in North America, known as ARCARO's "downline."  ARCARO earned a percentage, as much as 15%, of every investment that was made into the Lending Program through his downline.

46.   Under the Referral Program, to persuade investors to invest, ARCARO and other promoters posted videos to their social medial pages that contained materially false and misleading statements about the profits that they could earn from investing in BitConnect's Lending Program.

47.   ARCARO also posted videos that showed ARCARO in Bali, Dubai, Thailand, and other exotic locations in order to depict ARCARO's lavish lifestyle as a top promoter for BitConnect, and posted videos in which he mocked those who questioned whether BitConnect had a Trading Bot and Volatility Software, the true identity of BitConnect's owner, and complained about losing their money in BitConnect.

48.   In addition to posting to his social media pages, ARCARO viewed live events as critical to persuading investors to invest in BitConnect, including by investing their retirement and life savings.  During one such event, BitConnect awarded ARCARO a Porsche in recognition of his success as a top BitConnect promoter.

49.   In a text message exchange on or about October 13, 2017, ARCARO told promoters in his downline under the Referral Program that, "When people get to events and they actually see human flesh that only existed on a computer screen, something clicks in your head and it becomes real only at that moment.  People just want to be part of something bigger than themselves.  They're bored they're [sic] lives generally suck.  If they feel like they belong somewhere, all the guards come down, that's when they start investing for real."

50.     ARCARO further stated that these investors did not invest "this little 10k, 20k shit but real dough which is usually accessed in 401ks iras etc…"

51.     The Referral Program was essentially a Pyramid Scheme that rewarded promoters who successfully recruited investors to invest. In fact, in its marketing materials, BitConnect depicted the Referral Program as a multi-level pyramid.

### BitConnect's Development Fund

52.     To reward promoters for luring investors, BitConnect paid promoters additional income from a fund known as the Development Fund, which was essentially a slush fund of investors' money. Promoters could use these funds to market BitConnect and for the national promoters' own personal use. The promoters would also have discretion to allocate portions of the Development Fund to the promoters in their downline.

53.     The BitConnect Founder directed national promoters to conceal and hide the existence of the Development Fund from the public. The BitConnect Founder did not want the public to know how investors' money was being diverted and spent.

54.     In a text message exchange on November 28, 2017, with the knowledge and encouragement of the BitConnect Founder, ARCARO directed promoters in his downline to conceal and mislead potential investors about the Development Fund. ARCARO stated: "BitConnect honchos say don't talk about the development fund on video. Big no no in their eyes. You're supposed to phrase it all as if it's coming from you. Just don't mention that they [BitConnect] are funding."

55.     Similarly, in a text message exchange on November 28, 2017, ARCARO directed his downline promoters: "Don't ever show your dev fund on camera. If you have videos showing that fund, gotta take it down."

56.     As a result of the BitConnect Founder, ARCARO, and other promoter's concealment of the Development Fund, investors would not know that up to 15% of their investment was being syphoned into the Development 'slush' Fund and not invested as promised by BitConnect.

*Creation of Future Money*

57.     On or about October 12, 2017, during the BitConnect scheme, ARCARO created an entity called "Future Money," which was a purported educational program for individuals interested in investing in cryptocurrency.  ARCARO funded Future Money with investor money that he received from BitConnect.

58.     Future Money was a sales funnel for BitConnect which ARCARO used to lure additional investors into BitConnect's Lending Program.

59.     Upon completion of the Future Money course, Future Money directed its graduates to open BitConnect accounts using ARCARO's and his network's referral links.

60.     In addition, ARCARO caused the Future Money course to be designed to allow the BitConnect referral links to be replaced by referral links for other future, HYIPs in cryptocurrency.

61.     ARCARO's purpose in developing Future Money was to identify a pipeline of investors, starting with investors in BitConnect.

*Concealment of BitConnect Proceeds*

62.     In the fall of 2017, ARCARO contacted Firm 1.  At this time, ARCARO began to make plans to transmit the BitConnect proceeds that he earned to offshore bank accounts, transform some of the proceeds into precious metals storage, and obtain foreign passports.

63.     ARCARO described himself to Firm 1 as the "the number one promoter" of BitConnect and stated that he wanted to avoid becoming "too big of a target as known as the guy with all the bitcoin."

64.     ARCARO further stated to Firm 1 that his, "U.S. citizenship, the tax rates, the – just the kind of the – you know, this all seeing eye of Uncle Sam, just kind of physically weighs on my shoulders."  ARCARO's stated goal, "was to stack as much bitcoin as I could because I see that really benefiting in the future along with gold and silver."

65.     In sum, ARCARO's goal was to avoid paying federal and state income taxes on his income earned from the BitConnect Scheme and to shield his assets from collection by the Internal Revenue Service.

1    ***Collapse of the BitConnect Scheme***

2        66.    Shortly after ARCARO's conversations with Firm 1, and as the BitConnect
3    Ponzi scheme grew in size and scope, government regulators began to question the
4    fraudulent appearance of the Scheme and took steps to shut down BitConnect's operation
5    in specific states.

6        67.    For example, on or about January 4, 2018, the Texas State Securities Board
7    issued an Emergency Cease And Desist Order against BitConnect in which the Securities
8    Commissioner of the State of Texas concluded that BitConnect had engaged in fraud, made
9    materially false and misleading statements to investors in Texas, and sold unlicensed
10    securities.

11        68.    Similarly, on or about January 9, 2018, the Secretary of State of North
12    Carolina - Securities Division issued a Temporary Cease and Desist Order against
13    BitConnect to prevent BitConnect from further violating state securities laws because the
14    State had concluded that the BitConnect's investment offerings were unregistered
15    securities.

16        69.    Shortly after the cease-and-desist orders were entered, on January 16, 2018,
17    BitConnect abruptly shut down the Lending Program. From its peak price in early January
18    2018 to the closing price in the aftermath of the BitConnect shutdown, the price of BCC
19    plunged 98% in value.

20        70.    Investors were unable to withdrawal their investments after BitConnect
21    shutdown.

22    ***The Wire Fraud Conspiracy***

23        71.    Beginning at least as early as in or around 2017, and continuing through at
24    least in or around 2018, both dates being approximate and inclusive, in the Southern
25    District of California and elsewhere, ARCARO, together with the BitConnect Founder and
26    others known and unknown, knowingly combined, conspired, and agreed to commit an
27    offense against the United States, namely, wire fraud, in violation of 18 U.S.C. § 1343, to
28    wit: ARCARO executed and attempted to execute a scheme to defraud BitConnect

13

1  investors and potential BitConnect investors and to obtain money or property by means of
2  false or fraudulent pretenses, representations, or promises, through use of interstate wire
3  communications, within the Southern District of California and elsewhere, all in violation
4  of 18 U.S.C. § 1349.
5  ***Purpose of the Conspiracy***
6        72.   It was the purpose of the conspiracy for ARCARO and his co-conspirators to
7  unlawfully enrich themselves by: (1) inducing investors to invest in BitConnect through
8  materially false and fraudulent pretenses, representations, promises, and omissions; (2)
9  generating revenue for BitConnect and earning money through commissions and
10  development funds based on the volume of investors who invested in BitConnect; and (3)
11  concealing the conspiracy.
12        73.   ARCARO and his co-conspirators participated in a combined Ponzi/Pyramid
13  scheme that they operated through BitConnect's Lending and Referral Programs. The
14  conspiracy included, but was not limited to, the following manner and means described
15  below.
16      ***Manner and Means of the Conspiracy***
17        74.   It was a part of the conspiracy that:
18          a.   ARCARO and his co-conspirators, through use of interstate wire
19  communications, discussed the Scheme over Internet chats and text messages,
20  posted videos to social media platforms encouraging investment in BitConnect, and
21  used the BitConnect Website to promote the scheme.
22          b.   ARCARO and his co-conspirators made and caused others to make
23  materially false and fraudulent pretenses, representations, and promises to, and to
24  conceal material facts from, investors regarding BitConnect's Lending Program and
25  purported Trading Bot and Volatility Software.
26          c.   ARCARO and his co-conspirators made materially false and fraudulent
27  representations to, and concealed material facts from, investors regarding the profits
28  they could make from their investments in BitConnect's Lending Program.

d.    ARCARO and his co-conspirators made materially false and fraudulent representations to, and concealed material facts from, investors regarding BitConnect's Development Fund.

e.    ARCARO and his co-conspirators caused investors to invest over $2 billion in BitConnect and deposit those funds in the BitConnect cluster of cryptocurrency wallets.  ARCARO's co-conspirators, acting through BitConnect, then laundered the investors' funds by paying earlier investors with money from newer investors in order to promote the fraud and by disguising the source, origin, control, and location of the investors' funds in order to conceal the fraud.

f.    BitConnect also evaded and circumvented FinCEN's MTB regulations as to the operation of the BitConnect Exchange, and SEC's regulations governing the offer and sale of securities in the form of investments in the Lending Program.

76.    ARCARO reported no less than $24 million in income in his 2017 U.S. individual income tax return from his role as a top promoter for BitConnect.

77.    ARCARO committed all of the above acts knowingly and with the intent to defraud.

**C.    <u>Penalties</u>**

The crime to which Defendant is pleading guilty carries the following penalties:

**Count 1—Conspiracy to Commit Wire Fraud**

A.    a maximum 20 years in prison;

B.    a maximum $250,000 fine, or if greater, twice the gross gain or twice the gross loss;

C.    a mandatory special assessment of $100;

D.    a term of supervised release of up to 3 years. Failure to comply with any condition of supervised release may result in revocation of supervised release, requiring Defendant to serve in prison, upon revocation, all or part of the statutory maximum term of supervised release.

Defendant may also be subject to an order: (i) of restitution to victims of the offense; and (ii) of forfeiture for any property constituting, or derived from, proceeds Defendant

obtained directly or indirectly, as the result of a violation of 18 U.S.C. § 1349, as set forth in the incorporated financial addendum governing restitution and forfeiture proceedings in this case.  Defendant understands the Court may order restitution and forfeiture in any amount supported by the evidence at sentencing.

## III
## DEFENDANT'S WAIVER OF TRIAL RIGHTS AND UNDERSTANDING OF CONSEQUENCES

This guilty plea waives Defendant's right at trial:

A.     To continue to plead not guilty and require the United States to prove the elements of each crime beyond a reasonable doubt;

B.     To a speedy and public trial by jury;

C.     To the assistance of counsel at all stages of trial;

D.     To confront and cross-examine adverse witnesses;

E.     To testify and present evidence and to have witnesses testify on behalf of Defendant;

F.     Not to testify or have any adverse inferences drawn from the failure to testify; and

G.     Defendant knowingly and voluntarily waives any rights and defenses Defendant may have under the Excessive Fines Clause of the Eighth Amendment to the United States Constitution to the forfeiture of property in this proceeding or any related civil proceeding.

H.     To assert now, or on appeal, any legal, constitutional, statutory, regulatory, and procedural rights and defenses that he may have under any source of federal or common law, including among others, challenges to personal jurisdiction, extraterritoriality, statute of limitations, venue, and the form and substance of the Information, including specifically any claim of multiplicity or duplicity.

## IV
## DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE-DEFENSE INFORMATION

Any information establishing the factual innocence of Defendant known to the undersigned prosecutor in this case has been turned over to Defendant.  The United States will continue to provide such information establishing the factual innocence of Defendant.

If this case proceeded to trial, the United States would be required to provide

1   impeachment information for its witnesses.  In addition, if Defendant raised an affirmative
2   defense, the United States would be required to provide information in its possession that
3   supports such a defense.    By pleading guilty Defendant will not be provided this
4   information, if any, and Defendant waives any right to this information.  Defendant will
5   not attempt to withdraw the guilty plea or to file a collateral attack based on the existence
6   of this information.

## V
## DEFENDANT'S REPRESENTATION THAT GUILTY
## PLEA IS KNOWING AND VOLUNTARY

9   Defendant represents that:

A.    Defendant has had a full opportunity to discuss all the facts and circumstances
       of this case with defense counsel and has a clear understanding of the charges
       and the consequences of this plea. By pleading guilty, Defendant may be
       giving up, and rendered ineligible to receive, valuable government benefits
       and civic rights, such as the right to vote, the right to possess a firearm, the
       right to hold office, and the right to serve on a jury.  The conviction in this
       case may subject Defendant to various collateral consequences, including but
       not limited to revocation of probation, parole, or supervised release in another
       case; debarment from government contracting; and suspension or revocation
       of a professional license, none of which can serve as grounds to withdraw
       Defendant's guilty plea.

B.    No one has made any promises or offered any rewards in return for this guilty
       plea, other than those contained in this agreement or otherwise disclosed to
       the Court.

C.    No one has threatened Defendant or Defendant's family to induce this guilty
       plea.

D.    Defendant is pleading guilty because Defendant is guilty and for no other
       reason.

## VI
## AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE
## SOUTHERN DISTRICT OF CALIFORNIA AND USDOJ/FRAUD SECTION

       This Plea Agreement is limited to the United States Attorney's Office for the
Southern District of California, and the United States Department of Justice, Fraud Section,
and cannot bind any other authorities in any type of matter, although the United States will
bring this Plea Agreement to the attention of other authorities if requested by Defendant.

17

Def. Initials 

## VII
## APPLICABILITY OF SENTENCING GUIDELINES

The sentence imposed will be based on the factors set forth in 18 U.S.C. § 3553(a). In imposing the sentence, the sentencing judge must consult the United States Sentencing Guidelines ("Guidelines") and take them into account. Defendant has discussed the Guidelines with defense counsel and understands that the Guidelines are only advisory, not mandatory. The Court may impose a sentence more severe or less severe than otherwise applicable under the Guidelines, up to the maximum in the statute of conviction. The sentence cannot be determined until a presentence report ("PSR") is prepared by the U.S. Probation Office and defense counsel and the United States have an opportunity to review and challenge the presentence report. **The parties agree to request a PSR.** Nothing in this Plea Agreement limits the Government's duty to provide complete and accurate facts to the District Court and the U.S. Probation Office.

## VIII
## SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE

This Plea Agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B). The sentence is within the sole discretion of the sentencing judge who may impose the maximum sentence provided by statute. It is uncertain at this time what Defendant's sentence will be. The United States has not made and will not make any representation about what sentence Defendant will receive. Any estimate of the probable sentence by defense counsel is not a promise and is not binding on the Court. Any recommendation by the United States at sentencing also is not binding on the Court. If the sentencing judge does not follow any of the parties' sentencing recommendations, Defendant will not withdraw the plea.

## IX
## PARTIES' SENTENCING RECOMMENDATIONS

A.   <u>Sentencing Guideline Calculations</u>

Although the Guidelines are only advisory and just one factor the Court will consider under 18 U.S.C. § 3553(a) in imposing a sentence, the parties will jointly recommend the

18

Plea Agreement

Def. Initials 

following Base Offense Levels, Specific Offense Characteristics, Adjustments, and Departures:

### Count 1

| | |
|---|---|
| Base Offense Level | |
| [USSG § 2B1.1(a)(2)] | 7 |
| Specific Offense Characteristics | |
| Financial Gain | |
| [USSG §§ 2B1.1(K) (> $9.5M)] | + 20 |
| 10+ Victims and Mass-Marketing | |
| [USSG § 2B1.1(b)(2)(A)] | + 2 |
| Adjustments - Aggravating Role [USSG § 3B1.1(c)] | + 2 |
| Adjustments - Acceptance of Responsibility [USSG § 3E1.1] | - 3 |
| Departures – Combination of Circumstances [USSG § 5K2.0] | -1 |

**B.**     **Acceptance of Responsibility**

Despite paragraph A above, the United States need not recommend an adjustment for Acceptance of Responsibility if Defendant engages in conduct inconsistent with acceptance of responsibility including, but not limited to, the following:

1.     Fails to truthfully admit the complete Factual Basis as stated in this Plea Agreement at the time the plea is entered, or falsely denies, or makes a statement inconsistent with, the factual basis set forth in this agreement;

2.     Falsely denies prior criminal conduct or convictions;

3.     Is untruthful with the United States, the Court, or probation officer;

4.     Contests or assists any third party in contesting the forfeiture of property seized in connection with this case, and in connection with the related forfeiture proceedings; or

5.     Breaches this Plea Agreement in any way.

**C.**     **Further Adjustments and Sentence Reductions, Including Those Under 18 U.S.C. § 3553**

Defendant may request or recommend additional downward adjustments, departures, or variances from the Sentencing Guidelines under 18 U.S.C. § 3553. The

1  United States may oppose any downward adjustments, departures, or variances not set forth
2  in Section IX, paragraph A above.

3      **D.**    **No Agreement as to Criminal History Category**

4      The parties have **no** agreement as to Defendant's Criminal History Category.

5      **E.**    **"Factual Basis" and "Relevant Conduct" Information**

6      The facts in the "Factual Basis" paragraphs of this agreement are true and may be
7  considered as "relevant conduct" under USSG § 1B1.3 and as the nature and circumstances
8  of the offense under 18 U.S.C. § 3553(a)(1).

9      **F.**    **Parties' Recommendations Regarding Custody**

10      The United States will recommend that Defendant be sentenced within the advisory
11  Guidelines range recommended by the United States at sentencing consistent with the
12  calculations above in Section IX.

13      **G.**    **Special Assessment / Fine / Restitution / Forfeiture**

14          1.    Special Assessment

15      The parties will jointly recommend that Defendant pay a special assessment in the
16  amount of $100.00 per felony count of conviction to be paid forthwith at time of
17  sentencing.  Special assessments shall be paid through the office of the Clerk of the District
18  Court by bank or cashier's check or money order made payable to the "Clerk, United States
19  District Court."

20          2.    Fine

21      The parties have no agreement on a recommended fine for Defendant, if any.

22          3.    Restitution & Forfeiture

23      The attached and hereby incorporated financial addendum shall govern restitution
24  and forfeiture proceedings in this case.

25      **H.**    **Supervised Release**

26      If the Court imposes a term of supervised release, Defendant will not seek to reduce
27  or terminate early the term of supervised release until Defendant has served at least 2/3 of
28  the term of supervised release and has fully paid and satisfied any special assessments, fine,

Plea Agreement

Def. Initials  _CA_

1  criminal forfeiture judgment, and restitution judgment.

## X
## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Defendant waives (gives up) all rights to appeal and to collaterally attack every aspect of the conviction and sentence, including any: (i) restitution order; and (ii) any forfeiture order.  The only exceptions are 1) Defendant may appeal a custodial sentence above the high end of the Guidelines range recommended by the United States at sentencing, and 2) Defendant may collaterally attack the conviction or sentence on the basis that Defendant received ineffective assistance of counsel.  If Defendant appeals, the United States may support on appeal the sentence, restitution order, and for the forfeiture order actually imposed.

## XI
## BREACH OF THE PLEA AGREEMENT

Defendant and Defendant's attorneys know the terms of this Plea Agreement and shall raise, before the sentencing hearing is complete, any claim that the United States has not complied with this agreement.  Otherwise, such claims shall be deemed waived (that is, deliberately not raised despite awareness that the claim could be raised), cannot later be made to any court, and if later made to a court, shall constitute a breach of this agreement.

Defendant breaches this Plea Agreement if Defendant violates or fails to perform any obligation under this agreement, including those in any attached and hereby incorporated addenda.  The following are non-exhaustive examples of acts constituting a breach:

1.  Failing to plead guilty pursuant to this agreement;

2.  Failing to fully accept responsibility as established in Section IX, paragraph B, above;

3.  Failing to appear in court;

4.  Attempting to withdraw the plea;

5.  Failing to abide by any court order related to this case;

6.  Appealing (which occurs if a notice of appeal is filed) or collaterally attacking

21

Def. Initials 

the conviction or sentence in violation of Section X of this Plea Agreement; or

7.    Engaging in additional criminal conduct from the time of arrest until the time of sentencing.

If Defendant breaches this Plea Agreement, Defendant will not be able to enforce any provisions, and the United States will be relieved of all its obligations under this Plea Agreement. For example, the United States may proceed to sentencing but recommend a different sentence than what it agreed to recommend above. Or the United States may pursue any charges including those that were dismissed, promised to be dismissed, or not filed as a result of this agreement (Defendant agrees that any statute of limitations relating to such charges is tolled indefinitely as of the date all parties have signed this agreement; Defendant also waives any double jeopardy defense to such charges). In addition, the United States may move to set aside Defendant's guilty plea. Defendant may not withdraw the guilty plea based on the Government's pursuit of remedies for Defendant's breach.

Additionally, if Defendant breaches this Plea Agreement: (i) any statements made by Defendant, under oath, at the guilty plea hearing (before either a Magistrate Judge or a District Judge); (ii) the Factual Basis statement in Section II.B in this agreement; and (iii) any evidence derived from such statements, are admissible against Defendant in any prosecution of, or any action against, Defendant. This includes the prosecution of the charge(s) that is the subject of this Plea Agreement or any charge(s) that the prosecution agreed to dismiss or not file as part of this agreement, but later pursues because of a breach by Defendant. Additionally, Defendant knowingly, voluntarily, and intelligently waives any argument that the statements and any evidence derived from the statements should be suppressed, cannot be used by the United States, or are inadmissible under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, and any other federal rule.

## XII
## CONTENTS AND MODIFICATION OF AGREEMENT

This Plea Agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral. No modification of this Plea Agreement

Plea Agreement

22

Def. Initials

1  shall be effective unless in writing signed by all parties.

2                                              **XIII**
3           **DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT**

4           By signing this Plea Agreement, Defendant certifies that Defendant has read it (or
5  that it has been read to Defendant in Defendant's native language). Defendant has
6  discussed the terms of this agreement with defense counsel and fully understands its
7  meaning and effect.

8                                              **XIV**
9                **DEFENDANT SATISFIED WITH COUNSEL**

10          Defendant has consulted with counsel and is satisfied with counsel's representation.
11  This is Defendant's independent opinion, and Defendant's counsel did not advise
12  Defendant about what to say in this regard.

13

14                                              RANDY S. GROSSMAN
15                                              Acting United States Attorney
16  DATED: ___8/27/21___

                                                Daniel C. Silva
17                                              Mark W. Pletcher
                                                Lisa J. Sanniti
18                                              Carl F. Brooker, IV
19                                              Assistant U.S. Attorneys

20                                              JOSEPH S. BEEMSTERBOER
21                                              Acting Chief
22
23                                              Kevin Lowell
                                                Trial Attorney
24
25  DATED: ___8/23/21___

26                                              Mary Carter Andrues
27                                              Vicki I. Podberesky
                                                Counsel for Defendant
28

Plea Agreement                      23                    Def. Initials _CA_

1
**IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" SECTION ABOVE ARE TRUE.**

2

3
DATED: _____8/23/21_____          _____

4                                                Glenn Arcaro
                                                 Defendant

5
Approved By:

6
Leah R. Bussell
Assistant U.S. Attorney

7
Chief, Asset Recovery Section
Southern District of California

8
Lisa H. Miller

9
Chief, Market Integrity & Major Frauds Unit
Fraud Section, Criminal Division

10
U.S. Department of Justice

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plea Agreement                    24                    Def. Initials

### **FINANCIAL ADDENDUM**

Defendant's conviction will include financial penalties such as restitution and forfeiture. This Financial Addendum is incorporated into and made part of Defendant's Plea Agreement, and the additional terms and warnings below apply.

**A.    Restitution**

1.    Based on the crime to which Defendant is pleading guilty, the Court will order restitution to the victims of the offense pursuant to 18 U.S.C. § 3663A.

2.    The amount of restitution ordered by the Court may include restitution to any person directly harmed by Defendant's criminal conduct in the course of the scheme, conspiracy, or pattern of conduct described in the Factual Basis statement in Section II.B in the Plea Agreement. If agreed to by the parties, the Court may also order restitution to persons other than the victims of the offense of conviction. Restitution may include losses arising from counts dismissed and charges not prosecuted, as well as all relevant conduct in connection with those counts and charges, if agreed to by the parties.

3.    The parties estimate the amount of restitution will be no less than $24,098,333 for victims of Count 1. Defendant understands that this is only an estimate based on currently available information. The United States will recommend restitution of at least $24,098,333, but the amount it ultimately recommends may be higher depending on information at sentencing. The Court may impose restitution of any amount based on information available at sentencing. Defendant agrees that a restitution award in a higher amount than stated herein is not grounds to withdraw Defendant's guilty plea. The Defendant also agrees that nothing in this Plea Agreement or Financial Addendum limits the Government's duty to provide complete and accurate facts to the District Court and the U.S. Probation Office to calculate restitution.

4.    The parties agree that notwithstanding any Court order, the total amount of restitution will be due and payable in full when Defendant is sentenced. The parties further agree that any payment schedule imposed by the Court establishes only a minimum obligation. Any payment schedule does not foreclose the United States from exercising all

Def. Initials _____

1  legal actions, remedies, and process available to collect the restitution judgment, including
2  but not limited to remedies pursuant to 18 U.S.C. §§ 3613 and 3664(m)(1)(A).  Defendant
3  will make a good-faith effort to pay the full restitution.

4          5.      Restitution shall be paid through the Office of the Clerk of the District Court
5  by bank or cashier's check or money order referencing the criminal case number and made
6  payable to the "Clerk, United States District Court."

7          6.      The United States may run credit and other financial reports on Defendant
8  using public and non-public databases and share such information with the Court and the
9  U.S. Probation Office.  Defendant also authorizes the Internal Revenue Service to transmit
10  to the United States Attorney's Office copies of his tax returns until restitution is paid in
11  full and will promptly execute any documents necessary to carry out this authorization.
12  Defendant agrees to authorize the release of all financial information requested by the
13  United States including, but not limited to tax information, bank account records, credit
14  history, and social security information.  Defendant waives notice of any subpoena issued
15  by the United States and deemed by the United States to be relevant to conduct a full
16  financial investigation.

17          7.      Not later than 30 days after execution of the Plea Agreement, Defendant shall
18  complete and provide to the United States, under penalty of perjury, a financial-disclosure
19  form listing all Defendant's current and projected assets and financial interests valued at
20  more than $1,000.  These include all assets and financial interests in which Defendant has
21  an interest (or had an interest prior to January 1, 2017), direct or indirect, whether held in
22  Defendant's name or in the name of another, in any property, in any jurisdiction, real or
23  personal, including marital and community property.  Defendant shall also identify all
24  assets valued at more than $5,000 which have been transferred to any third party since
25  January 1, 2017, including the location of the assets, the identity of the third party or parties,
26  and the amount of consideration received by Defendant for the transferred assets.
27  Additionally Defendant agrees to continue to provide updated and current financial
28  information sworn under penalty of perjury as requested by the United States until such

Plea Agreement Financial Addendum                       2                      Def. Initials _CA_

1   time as the judgment debt including any and all accrued interest is paid in full.  Defendant

2   agrees to provide all supporting documentation for the financial statements including, but

3   not limited to, state and federal income tax returns, bank and brokerage statements of

4   accounts, and real property records.

5          8.      From the date this Plea Agreement is executed until restitution is paid in full,

6   Defendant shall immediately notify the Asset Recovery Section of the United States

7   Attorney's Office of any interest in property worth more than $1,000 that Defendant

8   obtains, directly or indirectly, including any interest obtained under any other name or

9   entity, including a trust, partnership, or corporation.  The parties will jointly recommend

10  that this requirement also be imposed as a condition of supervised release.

11         9.      Defendant shall notify the Asset Recovery Section of the United States

12  Attorney's Office at least 30 days before Defendant transfers any interest in property

13  owned directly or indirectly by Defendant worth over $1,000, including any interest held

14  or owned under any other name or entity, including trusts, partnerships, or corporations.

15  The parties will jointly recommend that this requirement also be imposed as a condition of

16  supervised release.

17         10.     Defendant shall immediately notify the Asset Recovery Section of the United

18  States Attorney's Office of any material change in Defendant's financial condition.

19         11.     Defendant agrees that the restitution, and any other monetary penalty imposed

20  by the Court, will be entered into the Treasury Offset Program ("TOP") so that any federal

21  payment or transfer of returned property to Defendant will be offset and applied to pay the

22  unpaid judgment amount.  Defendant waives the administrative requirements of TOP,

23  including the requirement that the debt be delinquent or past due.  Defendant waives all

24  TOP notices, including notices of referral and entry into the TOP and of TOP offsets.

25  Defendant waives all rights to contest the TOP offsets.  Defendant acknowledges that all

26  judgment debts remain past due until paid in full and therefore, agrees that his debt will

27  remain in the TOP until paid in full.

28  / / /

Plea Agreement Financial Addendum

3

Def. Initials _CA_

**B.   Forfeiture**

12.   In addition to the penalties in the Plea Agreement, federal law states Defendant must forfeit to the United States any property constituting, or derived from, proceeds Defendant obtained directly or indirectly, as the result of a violation of 18 U.S.C. § 1349, as required under 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).  As part of Defendant's guilty plea to Count 1 of the Information, as set forth in section I of the Plea Agreement, Defendant consents to the forfeiture allegations of the Information and agrees to forfeit, via entry of a personal money judgment against Defendant, in the amount of at least $24,098,333.

13.   The money judgment against Defendant represents monies subject to forfeiture to the United States as property constituting, or derived from, proceeds Defendant obtained directly or indirectly, as the result of a violation of 18 U.S.C. § 1349 and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(2)(A).

14.   Defendant further agrees that the conditions for the substitution of assets for the full amount of the money judgment as set forth in 18 U.S.C. § 982(b) which incorporates 21 U.S.C. § 853(p) exist, and the United States may execute and collect the judgment against any and all other property up to the full amount of the forfeiture judgment.

15.   Defendant consents and agrees to the immediate entry of an order of forfeiture upon entry of the guilty plea.  Defendant agrees that upon entry of the order of forfeiture, such order shall be final as to Defendant.  Defendant agrees to immediately withdraw any claims in pending administrative or civil forfeiture proceedings to properties seized in connection with this case that are directly or indirectly related to the criminal conduct. Defendant agrees to execute all documents requested by the United States to facilitate or complete the forfeiture process.

16.   Defendant further agrees not to contest, or to assist any other person or entity in contesting, the forfeiture of property seized in connection with this case.  Contesting or assisting others in contesting the forfeiture shall constitute a material breach of the Plea Agreement, relieving the United States of all its obligations under the agreement including

but not limited to its agreement to recommend an adjustment for Acceptance of Responsibility. Defendant agrees that the criminal forfeiture money judgment imposed by the Court will be (i) subject to immediate enforcement, and (ii) submitted to TOP so that any federal payment or transfer of returned property Defendant receives may be offset and applied to the outstanding balance on the forfeiture judgment. Defendant waives all notices with respect to TOP and waives all rights to contest any and all offsets.

17.  Defendant waives all demand for payment of the forfeiture judgment and waives all notices for substitution of property to collect the full amount of the judgment.

18.  Defendant consents and agrees to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise defendant of this, pursuant to Rule 11(b)(1)(J), at the time the Court accepts the guilty plea(s).

19.  Defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States and to testify truthfully in any judicial forfeiture proceeding.

20.  Defendant agrees that the forfeiture provisions of this Plea Agreement are intended to, and will, survive Defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if Defendant had survived, and that determination shall be binding upon Defendant's heirs, successors, and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full.

21.  Defendant acknowledges and agrees that the forfeiture in this case includes entry of a personal money judgment against Defendant, and that interest shall accrue on the judgment from the date of entry of the Order of Forfeiture in accordance with 18 U.S.C.

1 § 3612(f) and 28 U.S.C. § 1961.  Defendant agrees that the United States may take all

2 actions available to it to collect the full amount of the judgment, including enforcement of

3 the judgment against substitute assets as provided in 21 U.S.C. § 853(p) and actions

4 available under the Federal Debt Collections Procedure Act.  Defendant further agrees that

5 the judgment may be executed against property wherever it is held and waives all rights to

6 contest the enforcement of the judgment.

7                                                 RANDY S. GROSSMAN
8                                                 Acting United States Attorney
9 DATED:  8/27/21
10                                                Daniel C. Silva
11                                                Mark W. Pletcher
12                                                Lisa J. Sanniti
13                                                Carl F. Brooker, IV
13                                                Assistant U.S. Attorneys

14                                                JOSEPH S. BEEMSTERBOER
15                                                Acting Chief
16                                                Kevin Lowell
17                                                Trial Attorney

18 DATED:  8/23/21
19
20                                                Mary Carter Andres
21                                                Vicki I. Podberesky
                                                 Counsel for Defendant

22 DATED:  8/23/21
23                                                Glenn Arcaro
24                                                Defendant
25
26
27
28

Plea Agreement Financial Addendum                      6                    Def. Initials  CA